Ruby CLARK, Plaintiff-Appellant,

v.

Dr. Bruce ERDMANN and Gundersen Clinic, Ltd.,
Defendants-Respondents,

LA CROSSE LUTHERAN HOSPITAL and State of
Wisconsin Patient Compensation Fund, Defendants.

Supreme Court

*No. 88-1946. Submitted on briefs January 25, 1991.—Decided
April 23, 1991.*

(Also reported in 468 N.W.2d 18.)

428

429

431

For the plaintiff-appellant there were briefs (in the court of appeals) by *Pamela J. Schmelzer* and *Schrank & Schultz*, Madison.

For the defendants-respondents there was a brief (in the court of appeals) by *Daniel T. Flaherty, Ellen M. Frantz* and *Johns & Flaherty, S.C.*, La Crosse.

STEINMETZ, J. The primary issue is whether this action is governed by the medical malpractice statute of limitations of sec. 893.55, Stats.,[1] or, alternatively, the personal injury statute of limitations of sec. 893.54.[2] Judge Michael J. Mulroy, circuit court for La Crosse county, determined sec. 893.55 to be the proper statute. Applying the statute, he proceeded to grant the defendant's motion for summary judgment. Pursuant to sec. 809.61, we accepted this case on certification from the court of appeals to determine whether sec. 893.55 is applicable and, if so, whether it calls for the granting of the summary judgment motion in this case. Our determination is in the affirmative, and so we affirm the decision of the circuit court.

Plaintiff Ruby Clark had corrective surgery performed on her right foot by defendant Dr. Bruce Erdmann, a podiatrist associated with defendant Gundersen Clinic, Ltd., in August 1981. Clark had four postoperative visits with Dr. Erdmann, two of which

___

[1]For all time periods relevant to the case at bar, sec. 893.55, Stats., provided in pertinent part as follows:

**Limitation of actions; medical malpractice.**
**(1)** Except as provided by sub. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based, shall be commenced within the later of:
(a) Three years from the date of the injury, or
(b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

[2]Section 893.54, Stats., states in pertinent part:

**Injury to the person.** The following actions shall be commenced within 3 years or be barred:
**(1)** An action to recover damages for injuries to the person.

433

occurred in September 1981 and two of which occurred in October 1981. A follow-up appointment scheduled for January 1982 was cancelled by Clark. She had no further contact with Dr. Erdmann until April 1984.

Sometime subsequent to the operation, Clark began to have trouble with both of her feet, including the large toe of the foot on which Dr. Erdmann had operated. Specifically, the toe slowly began to turn inward, toward the center of the body. In this regard, Clark visited a Dr. Davey, an orthopedic surgeon, in April 1982. In December 1983, she visited a Dr. Forrette, another podiatrist. At her deposition, Clark stated that six months prior to this visit she had already considered Dr. Erdmann's 1981 surgery unsuccessful. Clark saw Dr. Forrette again in April 1984. In her own words, "Then, well I knew that the surgery was not satisfactory. I knew that by looking at it, but wasn't until June 1984 that I decided I would get another opinion."

Clark again visited Dr. Erdmann, twice in April 1984 and once in May 1984. She stated that she wanted Dr. Erdmann to see the results of his surgery. Specifically, she stated that her primary reason for going was to let Dr. Erdmann see "what a mess my foot looked like." "I told him it was way out of line," she testified. In the notes he took at the May visit, Dr. Erdmann wrote that "her right foot did well, however, today as I look at it there appears to be a slight component of varus to the digit." Dr. Erdmann suggested that Clark have surgery on the right foot at that time. These were not visits for treatment.

Clark also saw Dr. Davey again in June 1984, and she reported that Dr. Davey at that time said concerning her right foot, "Well, the damage is done." Clark had another visit with Dr. Erdmann in July 1984. In August 1984, Clark had her last visit with Dr. Erdmann. At this

time, Dr. Erdmann indicated that he was planning additional surgery on Clark's right foot and that anesthesia clearance had been obtained. However, Clark chose not to proceed under Dr. Erdmann's care.

In April 1985, Clark visited a Dr. Kurland, another orthopedic surgeon. Clark stated that Dr. Kurland told her at that time that "he thought the Gundersen Clinic should see what a mess they made of this toe."[3] During the same month of April 1985, Clark again visited with specialists at the Gundersen Clinic. A Dr. Tompkins noted at this time that Clark had a "significant post-operative hallux varus deformity." In September 1985, a team of clinic personnel, not including Dr. Erdmann, performed corrective surgery on Clark's right foot. Clark knew at this time that this second operation was to repair "the mess" resulting from Dr. Erdmann's operation on her foot in 1981. She stated, "and until I saw these doctors, i.e., Kurland and Davey, and they told me all this, I knew my foot was in bad shape and surgery was not—was a failure, but I didn't realize that perhaps it was [Dr. Erdmann's] fault."

Clark did not file her complaint until February 1987. In her complaint, Clark alleged that the care and treatment she received from Dr. Erdmann was negligent and that it harmed her. The complaint indicated that the alleged negligence of Dr. Erdmann extended well beyond the date of the 1981 surgery and post-operative visits and continued up through the time of Clark's second set of visits with Dr. Erdmann in 1984. Dr. Erdmann moved for summary judgment, claiming that the action was time barred. Dr. Erdmann in effect claimed that the alleged negligent treatment by him of Clark occurred in 1981 and did not extend beyond that

---

[3]It appears from the record that neither Dr. Kurland, Dr. Davey nor Dr. Forrette was affiliated with the Gundersen Clinic.

time. Dr. Erdmann also maintained that Clark discovered, or should have discovered, her injuries no later than 1985.

Applying sec. 893.55, Stats., the trial court granted summary judgment to Dr. Erdmann, concluding that Clark's action was time barred. The court rejected any argument by Clark that Dr. Erdmann had provided continuing negligent treatment pursuant to *Tamminen v. Aetna Casualty & Surety Co.,* 109 Wis. 2d 536, 558, 327 N.W.2d 55 (1982). The court found that Clark had not submitted evidence showing any negligent treatment occurred after the surgery and post-operative visits in 1981, *i.e.,* when Clark started to see Dr. Erdmann again, in 1984. Thus, the court held that the action had not been filed within the three-year time limit of sec. 893.55(1)(a). The court also concluded that, as a matter of law, Clark discovered, or should have discovered, her injuries no later than April 1985. Accordingly, the court held, the action had not been filed within one year of discovery as required by sec. 893.55(1)(b). The court thus granted Dr. Erdmann's motion for summary judgment.

\*   \*   \*   \*

Resolution of this controversy depends upon whether the action is governed by the medical malpractice statute of limitations set forth in sec. 893.55, Stats., or, alternatively, by sec. 893.54, which provides the statute of limitations period for injuries to the person. While either statute considered independently could be applicable, only one actually can be applied. Section 893.55 clearly is the more specific of the two statutes. Unlike sec. 893.54, it concerns itself not only with injury to the person, but also with a particular way in which the

injury arises, *i.e.*, resulting from an act or omission of a "health care provider." Thus, it is appropriate that we begin our analysis with sec. 893.55 in order to determine if its terms are met.

Whether sec. 893.55, Stats., applies here depends upon whether its use of the term "health care provider" includes podiatrists. If and only if that is the case, Dr. Erdmann is a "health care provider" and sec. 893.55 is applicable. If "health care provider" under sec. 893.55 does not include podiatrists, then sec. 893.54 instead of sec. 893.55 would be the appropriate statute. Insofar as no definition of "health care provider" under sec. 893.55 is given within ch. 893, the full meaning of the term is not immediately apparent.

In determining that the term "health care provider" includes podiatrists, the trial court referred to the fact that in 1981, when the plaintiff's injury commenced, and until July 1986, sec. 655.001(8), Stats., expressly defined "health care provider" as including podiatrists for purposes of the chapter to which it pertains.[4] The plaintiff

---

[4]Section 655.001, Stats., 1983–84 which is part of the chapter on health care liability and patients compensation, expressly provided that podiatrists were included within its definition of "health care providers." Specifically, sec. 655.001(8) provided that:

> 'Health care provider' means a medical or osteopathic physician or podiatrist licensed under ch. 448; a nurse anesthetist licensed or registered under ch. 441; a partnership comprised of such physicians, podiatrists or nurse anesthetists; a corporation owned by such physicians, podiatrists or nurse anesthetists and operated for the purposes of providing medical services . . ..

The express inclusion of "podiatrists" within the statute was the result of ch. 185, Laws of 1979, which made that inclusion effective July 1980. Prior to that time, "podiatrists" were not expressly included in the statute. As a result of ch. 340, Laws of 1985, express mention of "podiatrists" was removed from sec.

agrees that sec. 655.001(8) is relevant to a determination of whether podiatrists are "health care providers" under sec. 893.55, but points out that effective July 1986 the word "podiatrists" was stricken from the definition of "health care provider" in sec. 655.001(8). The plaintiff argues, on the basis of our decision in *Boggs v. Morden,* 117 Wis. 2d 773, 345 N.W.2d 490 (1984), that the legislative amendment to sec. 655.001(8) is to be given retroactive effect such that podiatrists are not included within the meaning of "health care providers" under sec. 893.55 for purposes of this case.

"The meaning of a statute is a question of law which we review without deference to the lower courts." *Schmidt v. Employe Trust Funds Board,* 153 Wis. 2d 35, 41, 449 N.W.2d 268 (1990). In ascertaining a statute's meaning, our "initial inquiry is to the plain meaning of the statute." *Id.* If the statute is unambiguous, resort to judicial rules of interpretation and construction is not permitted; the words of the statute must be given their obvious and intended meaning. *Id.*

The term "health care provider" in sec. 893.55, Stats., plainly applies to anyone who professionally pro-

---

655.001(8), and that removal has remained up to today. Section 655.001(8) provides, in pertinent part, as follows:

    (8)   'Health care provider' means any of the following:

    (a)   A medical or osteopathic physician licensed under ch. 448.

    (b)   A nurse anesthetist licensed under ch. 441.

    (c)   A partnership comprised of medical or osteopathic physicians or nurse anesthetists and organized and operated in this state for the primary purpose of providing the medical services of medical or osteopathic physicians or nurse anesthetists.

    (d)   A corporation organized and operated in this state for the primary purpose of providing the medical services of medical or osteopathic physicians or nurse anesthetists.

vides health care to others. Podiatrists do exactly that: they provide health care to others; and, like other professional health care providers, they are licensed to practice by the state medical examining board pursuant to ch. 448, Stats.[5] Accordingly, it is our determination that "health care provider" under sec. 893.55 includes podiatrists. Unless and until the legislature provides otherwise, we shall regard podiatrists as being "health care providers" under sec. 893.55. We note that our decision is consistent with the instruction of sec. 990.01(1), which provides that words and phrases that are not technical and other words not having a peculiar meaning in the law should be construed according to common and approved usage.

██

In our determination, sec. 655.001(8), Stats., is not particularly instructive to our treatment of sec. 893.55 in the instant case. Section 655.001(8) certainly does not exclude a broad definition of "health care provider" under sec. 893.55. To the contrary, to any extent sec. 655.001(8) is instructive here, it supports our broad reading of sec. 893.55.

██

For the entire period of time relevant to this case,[6] sec. 655.001(8), Stats., expressly defined "health care providers" as including podiatrists. That is, we do not

---

[5]Chapter 448, Stats., pertains to the licensing of physicians and physical therapists as well as podiatrists, and to the certifying of occupational therapists, occupational therapy assistants and respiratory care practitioners. Chapters 446, 447, 449, 451, and 455 pertain to the licensing or certifying of other professional health care providers.

[6]This period of time in part is determined by the point at which the plaintiff discovered or reasonably should have discovered her injury and the issue of whether or not the negligence of

agree with the plaintiff's argument that the legislative removal of the word "podiatrists" from sec. 655.001(8)'s definition of "health care providers" should be regarded as being of any meaningful retroactive effect for purposes of this case. The plaintiff's reliance upon *Boggs* is misplaced; that case involved a legislative amendment that was procedural and not substantive in nature. *Boggs*, 117 Wis. 2d at 775. The issue was whether the plaintiffs were required to file a submission of controversy with a patients compensation panel prior to commencing the circuit court action. In contrast, the legislative amendment to sec. 655.001 in effect amounts to a substantive amendment for purposes of the case at bar; the issue here clearly involves the parties' substantive rights. In the absence of clear legislative intent to the contrary, procedural statutes will be given retroactive application. *Id.* However, we consider the 1986 amendment to sec. 655.001(8), in which no particular legislative intent is apparent as to the issue before us, not to be of retroactive affect for our purposes insofar as it affected primarily the parties' substantive and not procedural rights.

Other statutory definitions of "health care provider" also support our determination that the term, as used in sec. 893.55, Stats., includes podiatrists. For example, sec. 146.81(1), which involves matters pertaining to patient records and confidentiality, has included "podiatrists" in its definition of "health care providers" for the entire period of time relevant to the case at bar. Similarly, sec. 154.01(3), which defines "health care professional" for purposes of Wisconsin's "natural death" law, includes within the term a person licensed under ch. 448, which, as noted above, includes a podiatrist such as

Dr. Erdmann was alleged to be "continuing." These matters will be discussed *infra*.

440

Dr. Erdmann. Moreover, sec. 154.03(1) expressly relies upon sec. 146.81(1)'s definition of "health care provider." Section 103.10(1)(e), which pertains to family or medical leave from employment, does the same thing, adding further support to our conclusion that "health care provider" generally is to be considered to include podiatrists.

Given that 893.55, Stats., includes podiatrists as "health care providers," that statute, and not sec. 893.54, constitutes the applicable statute of limitations in the instant case. Accordingly, we apply it to the facts of this case.

There is a standard methodology which a trial court follows when faced with a motion for summary judgment. *Green Spring Farms v. Kersten,* 136 Wis. 2d 304, 314, 401 N.W.2d 816 (1987), *citing Grams v. Boss,* 97 Wis. 2d 332, 338, 294 N.W.2d 473 (1980). The first step of that methodology requires the court to examine the pleadings to determine whether a claim for relief has been stated and a material issue of fact presented. *Grams,* at 338. If a claim for relief has been stated, the inquiry then shifts to the moving party's affidavits or other proof to determine whether the moving party has made a *prima facie* case for summary judgment under sec. 802.08, Stats. *Id.* To make a *prima facie* case for summary judgment, a moving defendant must show a defense which would defeat the plaintiff. *Id.* If the moving party has made a *prima facie* case for summary judgment, the court must examine the affidavits and other proof of the opposing party to determine whether there exist disputed material facts, or undisputed material facts from which reasonable alternative inferences may be drawn, sufficient to entitle the opposing party to a

trial. *Id.* Under sec. 802.08(2), summary judgment must be entered:

> 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'

*Kersten,* 136 Wis. 2d at 315.

When reviewing the grant of a summary judgment motion, we are required to apply the standards set forth in sec. 802.08, Stats., just as the trial court was to apply those standards. *Id.* When testing the sufficiency of a complaint, we take all facts pleaded by the plaintiff and all inferences which can reasonably be derived from those facts as true. *Id.* at 317. "Pleadings are to be liberally construed, with a view toward substantial justice to the parties. Section 802.02(6). The complaint should be dismissed as legally insufficient only if it is quite clear that under no circumstances can plaintiffs recover." *Id.*

In the instant case, Clark clearly has met the threshold requirement of stating a complaint. However, in light of Dr. Erdmann's motion for summary judgment, which has created a *prima facie* case for summary judgment, the legal sufficiency of the complaint hinges upon whether Clark stated a cause of action prior to the running of the applicable statute of limitations. Here, this question first depends upon whether Clark set forth facts sufficient to allege negligent treatment extending beyond February, 1984, *i.e.,* whether she raised an issue of fact as to the date of the last alleged negligent act or omission by Dr. Erdmann such that resolution of that issue in Clark's favor would mean pursuant to sec. 893.55(1)(a) that the statute of limitations had not yet begun to run

three years before she filed her complaint in February 1987.

Clark's complaint invokes the idea of "continuous" negligent treatment discussed in *Tamminen.* In *Tamminen,* we held that where it is alleged and where affidavits on summary judgment state that there is a continuing course of negligent treatment, there exists a single cause of action in relation to which the statute of limitations does not begin to run until the entire course of conduct ceases. *Tamminen,* 109 Wis. 2d at 558. Insofar as the plaintiff in *Tamminen* did so state particular acts and omissions of negligence on the part of the defendant "throughout the period of continuous treatment" which "occurred continuously during the period of treatment," *Id.* at 550–51, there existed a disputed issue of material fact as to the last date of negligent treatment. Summary judgment was therefore inappropriate. Similarly, in *Robinson v. Mt. Sinai Medical Center,* 137 Wis. 2d 1, 20, 402 N.W.2d 711 (1987), summary judgment was inappropriate because the plaintiffs there set forth statements sufficiently asserting continued negligence on the part of the defendant, thereby raising a dispute as to a material fact.

In the instant case, there is nothing in the pleadings or affidavits to indicate that there existed a continuous course of negligent treatment of Clark by Dr. Erdmann through 1984.

Neither Clark's complaint nor her affidavit specifically allege that Dr. Erdmann's care and treatment of her was continuous through 1984. Clark's affidavit in opposition to the summary judgment motion merely attached copies of medical records showing that she visited with Dr. Erdmann in 1984. It does not state that Dr. Erdmann provided negligent treatment in 1984, and

443

such an averment cannot reasonably be inferred.[7]

We have not adopted the continuous treatment rule.[8] As in *Tamminen* and *Robinson,* our focus here must be on the last *negligent* act or omission sufficiently alleged. Here, there is no evidence put forth by Clark to suggest that any negligent act or omission occurred after 1981. Accordingly, we hold as a matter of law that the alleged negligent treatment by Dr. Erdmann was not continued into 1984. No reasonable fact-finder could conclude to the contrary. Thus, summary judgment was appropriate under sec. 893.55(1)(a), Stats. Because of our holding, we do not reach the issue of whether a fact-finder could reasonably conclude that Dr. Erdmann's treatment of Clark, comprising both the first and second set of visits, was "continuous" according to *Tamminen.*

Our final consideration is whether summary judgment was inappropriate under sec. 893.55(1)(b), Stats., which involves the question of Clark's discovery of her injury.[9] Clark contends that under *Borello v. U.S. Oil*

---

[7]While one of the medical records attached to Clark's affidavit could be read extremely broadly to suggest in the most remote way some possibility that Dr. Erdmann negligently failed to inform Clark that she should not wait to have corrective surgery, for us to do so would amount to an unwarranted re-writing of the pleadings. That is to say, what this case presents is not a question of the sufficiency of a particular pleading but rather the total *absence* of a particular pleading necessary to raise an issue of material fact.

[8]We thus reject the inference to the contrary made in a concurring opinion in *Tamminen. See, Tamminen,* 109 Wis. 2d at 564 (Abrahamson, J., concurring).

[9]We note that sec. 893.55(1)(b), Stats., indicates that "an action may not be commenced under this paragraph more than 5 years from the date of the act or omission." Based upon our conclusion that Clark has not alleged a negligent act or omission

*Co.,* 130 Wis. 2d 397, 388 N.W.2d 140 (1986), no "discovery" took place for purposes of sec. 893.55(1)(b), and the statute of limitations did not begin to run, until July 1988, after this action was commenced, when she claims first to have received "objective verification" of her injury and its cause, which verification she maintains was provided by her expert witness.

We essentially agree with the implicit point made by Clark that the discovery provision of sec. 893.55(1)(b), Stats., is functionally equivalent to the "discovery rule" first set out in *Hansen v. A.H. Robins, Inc.,* 113 Wis. 2d 550, 560, 335 N.W.2d 578 (1983), and later developed in *Borello.* That does not mean, however, that we agree with Clark's overall argument.

In *Borello,* a complainant had been injured more than three years before filing her complaint and almost contemporaneously knew that she had been injured. However, in seeking medical confirmation of the cause of her injury, she was told repeatedly that the injury could not be associated with what it was later learned through a subsequent medical diagnosis had always been the cause of the injury. We said that under the discovery rule:

---

occurring after 1981, from which it follows for purposes of this case that the last negligent act or omission actually occurred in 1981, this language would require that Clark have commenced her action by 1986 at the very latest. Thus, because she did not commence her action until 1987, sec. 893.55(1)(b) effectively would bar her action. However, this point was neither briefed nor argued by the parties. We will therefore regard it as conceded by the defendant that Clark's action was commenced within the five-year time frame. We will proceed to consider, however, the defendant's argument that Clark otherwise failed to meet the requirements of sec. 893.55(1)(b).

445

> [A] cause of action will not accrue until the plaintiff
> discovers, or in the exercise of reasonable diligence
> should have discovered, not only the fact of injury
> but also that the injury was probably caused by the
> defendant's conduct.

130 Wis. 2d at 411. We held that such "discovery" requires more than a subjective belief on the part of the layperson plaintiff as to her injury and its cause. *Id.* at 412. Thus, the statute of limitations did not begin to run in *Borello* until the plaintiff "had a basis for objectively concluding" as to the fact of her injury and its cause. *Id.* at 414.

Dr. Erdmann contends that *Borello* does not require in this case the particular "objective verification" that Clark contends it requires. Rather, Dr. Erdmann maintains, the question of discovery under sec. 893.55(1)(b), Stats., is basically answered by the court of appeals decision in *Fritz v. McGrath,* 146 Wis. 2d 681, 690, 431 N.W.2d 751, 755 (Ct. App. 1988), in which the court of appeals indicated that discovery is not necessarily put "on hold" until some expert later "officially" confirms the injury and the fact that the actor was negligent. The court of appeals said:

> We do not believe, as Fritz's argument suggests,
> that a party must be specifically advised by an expert
> that, in the expert's opinion, he or she received negli-
> gent treatment from a physician before the injury
> may be considered to have been 'discovered.' All that
> is required is that the plaintiff knew or should have
> known that the injury existed and that it may have
> been caused by the defendant's conduct. *Borello,* 130
> Wis. 2d at 410, 388 N.W.2d at 145. And while there
> must be more than an unsubstantiated lay belief of
> the existence and cause of the injury on the plaintiff's
> part, there is no requirement that he or she must

have a full and specific 'magic word' medical or legal opinion before the statute will be deemed to start running.

*Id.* at 690.

Similarly, Dr. Erdmann relies on *Kempfer v. Evers,* 133 Wis. 2d 415, 395 N.W.2d 812 (Ct. App. 1986), in which the court of appeals applied the discovery rule in an action brought under the Federal Civil Rights Act, 42 U.S.C. sec. 1983 (1982). The plaintiff claimed that the defendants violated his constitutional rights during the time he was institutionalized in various state mental facilities. The court of appeals held that the action was barred by the statute of limitations, and noted:

> Accrual is based on the person's knowledge that he or she has been injured. [*Hansen,* 113 Wis. 2d] at 539. It is true that when the source of injury is unclear and the injured person has exercised reasonable diligence, the time of accrual may be extended until a causal connection can be established. [citing *Borello,* 130 Wis. 2d at 411]. However, neither *Hansen* nor *Borello* provide any authority for the proposition that the cause cannot accrue until the injured person is advised of his or her legal rights.

*Id.* at 419.

On the basis of *Fritz* and *Kempfer,* Dr. Erdmann maintains that Clark was presented with "reasonable likelihood for an objective belief," *see Borello,* 130 Wis. 2d at 404, such that for purposes of this case Clark discovered her injury no later than 1985. In this regard, he points to the statements made to Clark by Drs. Davey and Kurland to the effect that, "Well, the damage is done," and that Clark should have the clinic see "what a mess they made of" her foot.

447

We agree with Dr. Erdmann. While *Borello* is applicable to medical malpractice actions, it should not be read to say, as Clark asserts, that an "objective belief" sufficient to constitute "discovery" requires a plaintiff "officially" be informed by any expert witness of her injury, its cause or the relation between the injury and its cause. We thus approve of the language of the court of appeals in *Fritz* and *Kempfer*. While an unsubstantiated lay belief is not sufficient for discovery to occur, the existence of a reasonable likelihood for an objective belief as to an injury and its cause does not require any sort of formalistic approach as is suggested by Clark. If a plaintiff has information that would constitute the basis for an objective belief of her injury and its cause, she has discovered her injury and its cause. It does not matter whether her objective belief resulted from information "officially" obtained from an expert witness. Nor, as *Fritz* and *Kempfer* suggest, does it necessarily always matter whether the objective belief resulted at all from information obtained from any "expert" person.

Clark indicated as early as 1983 that she considered the surgery unsuccessful. She stated in 1984 that she knew the surgery was "not satisfactory." She obtained verification of her injury and its cause when in 1984 and 1985 she was informed to that effect by Drs. Davey and Kurland. In Clark's own words, "[U]ntil I saw these doctors, i.e., Kurland and Davey, and they told me all this, I knew my foot was in bad shape and surgery was not—was a failure, but I didn't realize that perhaps it was the doctor's fault." Moreover, unlike the plaintiff in *Borello,* Clark was never told by medical experts that her injury was not caused by what she ultimately determined to be its cause. Clearly, as a matter of law, Clark had the

448

basis for an objective belief by 1985 as to her injury and its cause. That is when she discovered her injury and its cause for purposes of this case.

There being no factual disputes or competing inferences to be drawn, and it being clear that Clark did not commence her action within the one year time period from the discovery of her injury in 1985 as required under sec. 893.55(1)(b), Stats., summary judgment was appropriate on that ground. Having been appropriate also under sec. 893.55(1)(a), the motion for summary judgment was properly granted by the trial court.

*By the Court.*—The judgment of the circuit court for La Crosse county is affirmed.