Jimetta CLAYPOOL, Marvin Claypool and Jennifer Claypool, Plaintiffs,†

v.

Mark R. LEVIN, M.D. and Wisconsin Patients Compensation Fund, Defendants-Respondents,†

AA INSURANCE COMPANY, and Columbia Hospital, Defendants,

Russell GOLDSTEIN and Wisconsin Lawyers Mutual Insurance Company, Defendants-Appellants.

Court of Appeals

*No. 94–2457. Submitted on briefs May 3, 1995.—Decided June 27, 1995.*

(Also reported in 536 N.W.2d 206.)

†Petition to review granted.

536

537

For the defendants-appellants the cause was submitted on the briefs of *Peterson, Johnson & Murray, S.C.*, with *Terry E. Johnson*, and *Peter F. Mullaney*, of Milwaukee.

For the defendants-respondents the cause was submitted on the briefs of *Hinshaw & Culbertson*, with

*Michael J. Pfau, Susan R. Tyndall*, and *Jeffrey R. Munson*, of Milwaukee.

Before Sullivan, Schudson and Myse, JJ.

SCHUDSON, J.   Attorney Russell Goldstein and his insurer, Wisconsin Lawyers Mutual Insurance Company, appeal from the trial court judgment granting summary judgment in favor of Dr. Mark R. Levin[1] and his insurer, Wisconsin Patients Compensation Fund, and dismissing the complaint of Jimetta Claypool, her husband, and her daughter against Dr. Levin. The issue is whether, under the medical malpractice statute of limitations, § 893.55(1), STATS., the Claypools "discovered" their injury despite their original lawyer's representation that he and his medical consultant had concluded that there was no viable cause of action. We conclude that such medical/legal advice may have rendered the Claypools "blamelessly ignorant" of their claim. We further conclude, however, that whether the Claypools exercised reasonable diligence to discover their injury remains a factual issue for the jury. Accordingly, we reverse and remand for further proceedings.

The posture of this case is unusual. On October 14, 1993, the Claypools filed an action claiming that Mrs. Claypool suffered severe permanent injuries as a result of alleged negligent treatment provided by Dr. Levin between March 6 and April 6, 1989. They also alleged legal malpractice against Russell Goldstein, the first lawyer to whom they had brought their case. Essentially, the Claypools claimed that Goldstein was

---

[1] The parties inconsistently spell Dr. Levin's name throughout the record as "Mark R. Levin" and "Marc R. Levin." We cannot determine which is the correct spelling.

539

negligent in advising them that they had no cause of action and that, as a result, they did not discover their potentially valid claim until they gained the advice of other counsel more than three years after the date of injury. The Claypools' complaint stated, in part:

> That the plaintiffs . . . retained the services of the defendant, Russell Goldstein, to represent them in their claim for medical negligence; that . . . Goldstein was negligent in his representation including but not limited to letting the Statute of Limitations run; that without fact-finding, the plaintiffs cannot determine whether the Statute of Limitations has indeed expired, in which case . . . Goldstein would be liable for all damages and injuries resulting from defendant Mark R. Levin, M.D.;
>
> That the plaintiffs . . . believe that the Statute of Limitations for the claims against . . . Levin . . . has not expired because of the date upon which they discovered a viable claim did exist; that if actually such Statute of Limitations has expired, then their claims lie against . . . Goldstein, for attorney's negligence.[2]

Dr. Levin moved for summary judgment based on § 893.55(1), STATS., which in relevant part provides:

> an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care provider, regardless of the theory on which the action is based, shall be commenced within the later of:

---

[2] In their amended complaint, the Claypools stated that they "believe that the Statute of Limitations for the claims against . . . Levin . . . and any other health care providers herein above referred to have [sic] expired; that the plaintiffs further believe that said claims may have been stayed by virtue of the date of discovery of a viable claim."

540

(a)  Three years from the date of the injury, or

(b)  *One year from the date the injury was dis-covered or, in the exercise of reasonable diligence should have been discovered,* except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

(Emphasis added.) It is undisputed that the Claypools' action of October 14, 1993 was filed approximately four and one-half years after the period of Dr. Levin's treatment.

The Claypools did not oppose Dr. Levin's summary judgment motion. Mr. Goldstein, however, opposed the summary judgment because, as the trial court explained, "his liability, if any, [is] contingent upon" whether the Claypools' claim against Dr. Levin was foreclosed by the statute of limitations.[3] Therefore, although posed in this case by Mr. Goldstein rather than by Dr. Levin, the issue for the trial court at the summary judgment stage was whether there was a genuine issue of material fact, under § 893.55(1), STATS., regarding whether Mrs. Claypool's injury "in the exercise of reasonable diligence should have been discovered."

According to the summary judgment submissions, in March of 1989, Mrs. Claypool, very ill and uncon-scious, was taken to Columbia Hospital. During the next month of care by Dr. Levin, Mrs. Claypool suffered almost total loss of vision in both eyes during the period of her care by Dr. Levin. On April 10, 1989, shortly

---

[3] The trial court also concluded "that Goldstein being a defendant whose rights will be affected by this decision may properly interpose an objection to the motion." Although in the trial court the respondents challenged Mr. Goldstein's standing to oppose Dr. Levin's summary judgment motion, they have not challenged that aspect of the trial court's decision on appeal.

541

after her release from the hospital, Mrs. Claypool and her husband retained Mr. Goldstein and signed authorizations for the release of medical records so that he could evaluate the merits of a potential medical malpractice action. During the next six weeks, Mr. Goldstein wrote to the Claypools telling them that he had requested the medical records and bills, and that he was awaiting them "so that I can have them reviewed." He also wrote, "I will keep you advised of what is happening."[4]

Subsequent to that correspondence, Mr. and Mrs. Claypool had some contact and communication with Mr. Goldstein, but the dates were unspecified and the references to a possible medical malpractice claim were attenuated. In her deposition of February 24, 1994, Mrs. Claypool testified:

> Q: Did you personally have any conversations with Mr. Goldstein between April 10th, 1989, and the present date about this—his checking out this case for you?
> A: Oh, no.
> Q: Did you have any conversations with him regarding any other matters that he was handling for you?
> A: Yes.
> Q: And what matters had he been handling for you after April of 1989 that you discussed with him?
> A: My daughter—Well, I was a passenger in the car when my daughter had the accident, and I went with her down to retain his service for—to represent us.

---

[4] In his deposition, however, Mr. Claypool stated that he did not receive any correspondence from Mr. Goldstein after April 10, 1989.

542

Q: So are you testifying today that you had a personal injury claim arising out of an accident your daughter had after April 10th, 1989?

A: Yes, um-hm.

Q: And was that settled sometime between the time of the accident, which was after April 10th, 1989, and let's say July of 1992?

A: Yeah, I guess. Right, um-hm. I think.

Q: Did you at any time while he was representing you in that personal injury case say, "You know, Mr. Goldstein—or Russ—what's happening to this, the case with my eyes, with the doctors?"

A: No, I didn't.

In his deposition, Mr. Claypool testified about his limited contact with Mr. Goldstein and about their conversation when, by chance, they met in the courthouse.

Q: Did he ever call you?

A: No.

Q: Did you call him?

A: Yes.

Q: On how many occasions?

A: One or two, three times.

Q: And between, let's say, April 18th, 1989, and July of 1992, did Mr. Goldstein ever explain to you what he was doing?

A: No, he just briefly said that he's checking it out, and that the doctor felt there was no case.

Q: And that occurred in a conversation, as related by your wife, when you were on jury duty at the courthouse?

A: Yes.

Q: And where did you see Mr. Goldstein, in the hall?

A: It was in the cafeteria.

Q: Were you on a jury at that time, or were you just there—being summoned there to be called if they called you?

A: Right, summoned there if they called me.

Q: And what did Mr. Goldstein tell you?

A: He told us that the doctor feel [sic] that there was no case.

Q: And what was your response?

A: You know, I was just left hanging then, and I came back and told my wife what Mr. Goldstein said.

Q: Do you know what year that was that you were on jury duty?

A: I don't recall exact [sic].

Q: Well, was it 1992?

A: No, it wasn't.

Mrs. Claypool also stated that her husband told her about his courthouse conversation with Mr. Goldstein, who had told him "that the doctors that he had showed the case to did not see anything done wrong; and at that time my husband and I just drew the conclusion that there weren't a case." Subsequently, however, Ms. Claypool contacted the law firm of Warshafsky, Rotter, Tarnhoff, Gesler, Reinhardt & Bloch, S.C., which advised that she had a valid cause of action.[5]

The trial court concluded:

---

[5] Dr. Levin, without providing a record reference, asserts that "the Claypools took no additional steps to obtain a second opinion until consulting with the Warshafsky firm in the summer of 1993, some eighteen months later." We are unable to locate anything in the summary judgment submissions to establish exactly when the Claypools received advice from Goldstein and, therefore, the exact chronology remains uncertain. We agree, however, that whether the Claypools exercised "reasonable diligence" may depend on factors including the exact nature and timing of their communication with their attorneys.

[T]he undisputed facts can lead to but one reasonable inference, that is, in the exercise of reasonable diligence plaintiffs should have discovered the probable cause of the injury within a reasonably short period of time after the injury. The injury was immediately known and the potentially responsible health care providers were known almost immediately after the injury. Counsel was retained within weeks of the injury to conduct an investigation regarding the potential cause or causes of the injury.

. . . .

. . . The plaintiffs must be bound by the acts or omissions of their attorney agent. The only reasonable inference is that plaintiffs possessed sufficient information within a relatively short span of time from the injury to form an objective belief that Dr. Levin's treatment was a cause of the injury. It is clear that, had reasonable diligence been exercised, the claim against Dr. Levin should have been discovered well before a year from the date of injury.

The trial court decision also noted that "[t]he Claypools are not without a remedy," given their legal malpractice claim against Mr. Goldstein.

■■■■

Our review of a trial court's grant of summary judgment is *de novo*. *Groom v. Professionals Ins. Co.*, 179 Wis. 2d 241, 246, 507 N.W.2d 121, 123 (Ct. App. 1993). Summary judgment must not be granted if there is a genuine issue of material fact. RULE 802.08(2), STATS.

We look first to the complaint to determine whether it states a cause of action and, if so, we consider whether the answer states a defense. If it does, we examine the moving party's affidavits to see if the evidentiary facts alleged state a *prima facie* claim

> for relief. If they do, we turn to the affidavits in opposition to the motion to see whether they raise material factual issues. If they do not, the case is proper for disposition of the legal issues raised in the motion.

*Fritz v. McGrath*, 146 Wis. 2d 681, 683, 431 N.W.2d 751, 752 (Ct. App. 1988). Moreover, where a defendant's summary judgment submissions state a *prima facie* defense based on the statute of limitations, the party opposing summary judgment has the burden to establish the existence of disputed material facts to defeat summary judgment. *See id.* at 685-686, 431 N.W.2d at 753. Here, given the undisputed dates of Dr. Levin's treatment and the Claypools' filing of their suit, it is clear that the submissions stated a *prima facie* defense based on the statute of limitations.

Goldstein argues, however, that "[t]he only reasonable inference that can be drawn from the record evidence is that plaintiffs discovered their claim against Dr. Levin less than one year before filing suit" when the Warshafsky firm advised them that they had a cause of action. On appeal, therefore, Goldstein requests an order reversing summary judgment and declaring the Claypools' complaint timely as a matter of law. In the alternative, he seeks an order reversing summary judgment and remanding the case for a jury's determination of whether the Claypools exercised reasonable diligence.

Goldstein contends that *Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 388 N.W.2d 140 (1986), controls this case. In that case, Mary Borello experienced symptoms and disabilities that she suspected were caused by fumes from a new furnace recently installed in her home. *Id.* at 400-403, 388 N.W.2d at 141-142. However, "she was repeatedly told by physicians that her symptoms and

disabilities could not be the result of the furnace." *Id.* at 403, 388 N.W.2d at 142. Subsequently, she was advised by an occupational medicine specialist that her problems had resulted from the furnace fumes. Thus, in *Borello*, the supreme court was:

> confronted by a situation where a complainant was injured more than three years before the filing of the complaint and almost contemporaneously with that injury formed her own layperson's subjective opinion that the furnace was the cause. Yet, at every turn, she was told by professionals, who were assumed to be competent to diagnosis her ailment and its cause, that the furnace fume problem was irrelevant.
>
> Not until Dr. Fishburn made his diagnosis and findings was there any reasonable likelihood for an objective belief of a cause-and-effect relationship between the injury and the defective furnace.

*Id.* at 403-404, 388 N.W.2d at 142. The supreme court concluded that "discovery does not occur until there is information available to the claimant of the nature of her injury, the cause of her injury, and the defendant's part in that cause." *Id.* at 414, 388 N.W.2d 147. Accordingly, "[a] person who has used reasonable diligence to secure medical advice should be given the protection of one who is 'blamelessly ignorant' even though a prior hunch later proved to be correct. We cannot expect the ordinary person to take extraordinary steps to secure a full medical analysis." *Id.* (citation omitted).

Although *Borello's* language would seem to support Goldstein's argument, several subsequent decisions help to clarify distinguishing factors between *Borello* and the instant case. In *Fritz v. McGrath*, 146 Wis. 2d 681, 431 N.W.2d 751 (Ct. App. 1988), the plain-

tiff appealed from the summary judgment granted to her periodontal surgeon based on the statute of limitations. We emphasized that, under *Borello*, a cause of action accrues not when a plaintiff confirms causation with absolute certainty, but rather, when " 'the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, not only the fact of injury but also that the injury was *probably* caused by the defendant's conduct.' " *Fritz*, 146 Wis. 2d at 686-687, 431 N.W.2d at 754 (emphasis added; quoting *Borello*, 130 Wis. 2d at 411, 388 N.W.2d at 146). In *Fritz*, "[f]rom the very beginning, [the plaintiff] was satisfied that the dental surgery was the sole cause of her oral and facial problems." *Id.* at 688, 431 N.W.2d at 754-755. Similarly, Mrs. Claypool knew "that the injury existed and that it may have been caused by the defendant's conduct." *Id.* at 690, 431 N.W.2d at 755. As we explained:

> We do not believe . . . that a party must be specifically advised by an expert that, in the expert's opinion, he or she received negligent treatment from a physician before the injury may be considered to have been "discovered." All that is required is that the plaintiff knew or should have known that the injury existed and that it may have been caused by the defendant's conduct. And while there must be more than an unsubstantiated lay belief of the existence and cause of the injury on the plaintiff's part, there is no requirement that he or she must have a full and specific "magic word" medical or legal opinion before the statute will be deemed to start running.

*Id.* (citation omitted).

Similarly, in *Clark v. Erdmann*, 161 Wis. 2d 428, 468 N.W.2d 18 (1991), the supreme court emphasized that the authorities do not support " 'the proposition

548

that the cause cannot accrue until the injured person is advised of his or her legal rights.' " *Id.* at 447, 468 N.W.2d at 26 (citation omitted). In *Clark,* the supreme court affirmed a summary judgment dismissal in favor of a podiatrist based on the statute of limitations in a medical malpractice action. The court explained:

> If a plaintiff has information that would constitute the basis for an objective belief of her injury and its cause, she has discovered her injury and its cause. It does not matter whether her objective belief resulted from information "officially" obtained from an expert witness. Nor . . . does it necessarily always matter whether the objective belief resulted at all from information obtained from any "expert" person.

*Id.* at 448, 468 N.W.2d at 26.

Thus, at first glance, *Fritz* and *Clark* might seem to support the argument that the Claypools discovered their cause of action soon after Dr. Levin's treatment despite the subsequent advice from their lawyer. That, however, would be a misreading of *Fritz* and *Clark* that would swallow the sound principle of *Borello*. Significantly, in neither *Fritz* nor *Clark* was the claimant specifically advised that there was no cause of action. In *Fritz*, as we noted, the plaintiff "was told by the very first physician she visited either that her ailments were 'related to [the] dental surgery,' or, in her version, that it was 'possible' that the surgery was a cause of her present problem." *Fritz*, 146 Wis. 2d at 690-691, 431 N.W.2d at 755 (brackets in *Fritz*). In *Clark*, the supreme court pointed out that "unlike the plaintiff in *Borello*, Clark was never told by medical experts that her injury was not caused by what she ultimately

determined to be its cause." *Clark*, 161 Wis. 2d at 448, 468 N.W.2d at 26.

Thus, in this important regard, Goldstein correctly argues that *Borello* corresponds more exactly to the instant case. In *Borello*, a succession of specific medical opinions advising the plaintiff that her problems were not caused by the furnace reasonably deterred her from filing any action. *See id.*, 130 Wis. 2d at 401, 388 N.W.2d at 141. Here, although as the trial court's written decision noted, "[i]t is not clear what actions or investigation Attorney Goldstein pursued during the time he was representing the Claypools," certain important things are clear from the summary judgment submissions: the Claypools immediately believed Dr. Levin's treatment had caused Mrs. Claypool's injury; the Claypools promptly presented their case to Mr. Goldstein; the Claypools received medical/legal advice from Goldstein that Mrs. Claypool said led her and her husband to "dr[a]w the conclusion that there weren't a case"; and the Claypools then brought their case to other counsel for additional advice.

In support of summary judgment, however, Dr. Levin cites a footnote in *Groom v. Professionals Ins. Co.*, 179 Wis. 2d 241, 507 N.W.2d 121 (Ct. App. 1993) (statute of limitations barred medical malpractice action against other health care provider and insurer not originally named in complaint but identified in decedent's medical records where wife's cause of action arising from husband's death accrued when husband's medical records were sent to wife at her request), for the proposition that "[a] party is bound by the acts of her lawyer-agent and has notice of all facts in the possession of her attorney." *Id.* at 250 n.3, 507 N.W.2d at 125 n.3. The trial court adopted that reasoning and

concluded that the Claypools "must be bound by the acts or omissions of their attorney agent." We conclude, however, that although this principle under other circumstances may bind a client to the result of his or her lawyer's acts, *see Johnson v. Allis Chalmers Corp.*, 162 Wis. 2d 261, 470 N.W.2d 859 (1991) (court may dismiss products liability action for failure of attorney to comply with scheduling and discovery orders), this principle does not restrict our analysis of the Claypools' "discovery" to only what the Claypools understood when they brought their case to Goldstein. Indeed, in this context, this very principle would seem to carry the analysis to also encompass what the Claypools understood when Goldstein told them they had no cause of action. At that later point, regardless of what they may have suspected or understood previously, if they were "bound" by their lawyer's advice, they were bound by his advice carrying "all facts in [his] possession" including, most significantly, the "fact" that they had no viable claim.

Thus, the trial court's conclusion that "the only reasonable inference" is that the Claypools "possessed sufficient information within a relatively short span of time from the injury to form an objective belief that Dr. Levin's treatment was a cause of the injury" was an accurate expression of the Claypools' understanding at the point at which they presented their case to Goldstein. That, however, does not logically end the analysis because the Claypools' "discovery" as a matter of law was not necessarily locked in time by their initial belief given the subsequent events. To conclude otherwise would be to ignore the "ordinary person" standard of *Borello* and require a claimant "to take extraordinary steps to secure a full medical analysis" beyond

whatever counsel has obtained. *See Borello*, 130 Wis. 2d at 414, 388 N.W.2d at 147.[6]

Although Goldstein would also have us conclude, as a matter of law, that the Claypools did not discover their cause of action until they received advice from the Warshafsky firm, we can not do so based on this somewhat indefinite record. "The issue of reasonable diligence is ordinarily one of fact." *Spitler v. Dean*, 148 Wis. 2d 630, 638, 436 N.W.2d 308, 311 (1989) (discovery rule extended to allow tort action to accrue only after identity of defendant was known or reasonably should have been known but remanded for factual determination regarding plaintiff's diligence in attempting to discover the defendant's identity). When evaluating whether an individual has shown reasonable diligence we are mindful that, with respect to medical/legal advice, one's "trust and confidence . . . should not devolve into blind faith and exempt the plaintiff from the duty diligently to pursue potential claims." *Groom*, 179 Wis. 2d at 251 n.4, 507 N.W.2d at 125 n.4. As the supreme court explained, "[p]laintiffs may not close their eyes to means of information reasonably accessible to them and must in good faith apply their attention to those particulars which may be inferred to be within their reach." *Spitler*, 148 Wis. 2d

---

[6] We are not unmindful of Dr. Levin's concern that, in this case, Mr. Goldstein might seem to benefit because of his own alleged malpractice. That, we concede, is an irony resulting from the unusual circumstances of this case. Although we agree that, in virtually all circumstances, a lawyer's possible negligence certainly should not shield him or her from liability for legal malpractice, we are no less concerned that a lawyer's liability might improperly insulate a doctor from a potentially meritorious medical malpractice claim.

at 638, 436 N.W.2d at 311. Most recently, we explained that "[r]easonable diligence means such diligence as the great majority of persons would use in the same or similar circumstances. . . . If a plaintiff does not meet the reasonable diligence requirement, the discovery rule under § 893.55, STATS., does not apply." *Awve v. Physicians Ins. Co.*, 181 Wis. 2d 815, 823-824, 512 N.W.2d 216, 219 (Ct. App. 1994) (statute of limitations barred medical malpractice action arising from child's death where parents were not reasonably diligent because they "did not give good faith attention to the information within their reach about the cause of [their infant's] premature birth and subsequent death"). The uncertainty surrounding the nature and timing of the communication between Goldstein and the Claypools leaves the issue of the Claypools' reasonable diligence appropriate for a jury's determination.

*By the Court.*—Judgment reversed and cause remanded.