## GEORGE YUREKO v. PROSPECT FOUNDRY COMPANY AND ANOTHER.

115 N. W. (2d) 477.

May 11, 1962—No. 38,475.

*F. L. Palarine,* for relator.
*McLeod & Gilmore,* for respondents.

NELSON, JUSTICE.

Certiorari to review a decision of the Industrial Commission upon the relation of George Yureko, employee-relator. Employee in his claim for compensation .alleged that on December 17, 1954, while in the employ of Prospect Foundry Company of Minneapolis, he received a personal injury arising out of and in the course of his employment as a "shakeout man." He contends that he sustained a recurring injury to his eyes resulting in permanent disability. Employee claimed compensation and benefits against employer for permanent partial disability by reason of loss of vision in both eyes; hospital and medical expenses; allowance for healing period and retraining; and any other allowance to which he was entitled under the Workmen's Compensation Act. Employer and its insurer, Liberty Mutual Insurance Company, denied liability for compensation benefits.

Employee worked in the foundry of employer from 1941 until 1955. While he was apparently classified as a working foreman, nevertheless, as a "shakeout man" he did considerable pouring of hot, molten metal, except during the period between 1941 and 1944. This pouring of metal resulted in employee's frequently having his eyes within 2½ feet of the molten metal. There is testimony that when he poured metal from a cupola into a 1,000-pound ladle, the metal would appear to blaze up, as if exploding. At such times—according to employee's testimony, from 22 to 27 times a night when he was pouring —it could not be looked at. His testimony also was that his "shakeout" work—separating molds from castings—also brought his face within 2 feet of hot iron. During most of the years of his employment he wore protective goggles only when in the grinding room.

At the age of 45, in 1950, employee noticed that his vision was becoming dimmer. By 1955 it was discovered that he had bilateral cataracts, causing him to have vision of only 12/400 (Snellen Chart)

in each eye, which would render him industrially blind. He underwent two separate operations in 1955; on June 9, the lens was removed from his left eye, and on September 7, surgery was performed on his right eye. Without glasses his vision became less than 20/200 in each eye, indicating clearly that he was still industrially blind by present standards of the Workmen's Compensation Act. His eyes, however, corrected to normal, or 20/20, with glasses which were prescribed. As a result, following his operations, employee has worked at a wage nearly equivalent to what he was earning prior to the surgery.

At the hearing before the referee, employee contended that his cataracts were thermal (or radiation) ones caused by his employment. Although he alleged in his petition that he had suffered permanent partial disability, employee now claims that as a matter of law he is permanently totally disabled within the meaning of Minn. St. 176.101, subd. 5.

The referee denied compensation to employee, holding that the cataracts were not caused by his occupation. While the respondents contended that employee was not engaged in the pouring operations as frequently as he testified, the Industrial Commission found that the record clearly establishes that employee's testimony was correct and that the testimony of employee's brother and the time records of the company confirm employee's work history.

The medical testimony is conflicting. All the medical experts who testified were eye specialists with long years of practice in ophthalmology. Only one expert testified on behalf of employee, the specialist who had operated on his eyes. Three specialists were called on behalf of the employer and insurer. Two of those experts rendered their opinions on a hypothetical question; thus, primarily on theory. The third was a woman who had done much personnel work in the foundry industry and it was her testimony that employee's cataracts were not caused by his work. She testified that the temperature of the metal—approximately 2,000 degrees Fahrenheit—which employee poured, was not high enough; and she had not seen the same type of cataracts in employees with less than about 20 years' exposure.

The medical testimony in behalf of employee indicated that he was given a complete eye examination prior to the operations. It was found

that his vision could not be improved with corrective lenses and it was definitely established that he had cataracts which made surgery necessary. Employee's visual acuity in both eyes at the time of the examination was 12/400 according to Snellen Chart, which is considerably worse than 20/200 and was equivalent to industrial blindness, or 100-percent loss. Following the operations the lenses were sent to the laboratory for analysis. A pathological report showed that both lenses were diagnosed as cataract lenses. The testimony was uncontradicted that the employee had suffered a 100-percent permanent loss of the use of each eye without correction but that he had a visual acuity of 20/20 in each eye with correction. Employee's eye surgeon concluded his testimony with the statement that employee's corrected vision remains at 20/20 in both eyes, but that without the use of glasses his vision is less than 20/200. His surgeon stated that he must be classified as industrially blind without glasses.

All of the medical experts who testified agreed that one differential of a thermal cataract is the irregular breadcrumb-outline change in the posterior capsule of the lens. There was testimony by the surgeon who removed the lenses from employee's eyes that he noted on the anterior capsule of the lenses some flaking of the lens capsule "and an irregular breadcrumb opacafier over the posterior area of the lens."

One of the insurer's experts admitted the importance of an opinion from the operating surgeon who had the opportunity to see the actual lens removed. He gave the following testimony:

"Q. Wouldn't you say, Doctor, that the best person to be able to determine what type of a cataract this man had at the time that he was operated on would be the physician who attended him and who operated upon him and who examined him at the time?

"A. Yes."

The medical testimony indicates that cataracts have occurred in persons of all ages but that most senile cataracts occur in persons 55 years of age or older. The employee in this case was 45 years of age when the cataracts first appeared. According to the medical testimony no two persons have the same degree of susceptibility, the lens consisting of living, growing cells containing many different substances. This.

factor may account for the difference in the testimony regarding how many years of exposure is necessary to bring about cataracts among furnace or glass workers. This was borne out by the testimony of one of the insurer's experts who stated that the years of exposure necessary depends upon the person and the intensity of the heat. Employee's expert testified as follows:

"We know that certain individuals are more sensitive to heat, which is experienced in the occupation of glass blowing * * * foundry work * * * the type of work where they are close to molten metal. Particularly in large blast furnaces and steel furnaces where they would look in these peep holes to see this molten metal. Years ago before they had safety glasses, it was a very well known fact that they were * * * in certain glass-blowers cataracts, would tend to develop. Why it develops in one person and not another no one knows."

The commission came to the conclusion after weighing the conflicting testimony between the medical experts that the only reasonable cause of employee's cataracts was the furnace work he had engaged in since 1941 in employer's foundry.

We now come to the employee's claim that even though his corrected vision is 20/20 in each eye he is still permanently totally disabled. He makes this claim in spite of the fact that he earns $1.60 per hour, which amounts to 10¢ per hour less than he was earning at the time of his injury. As we have already stated, he bases his claim upon § 176.101, subd. 5, which defines "total disability" as follows:

"The total and permanent loss of the sight of both eyes * * * or any other injury which totally incapacitates the employee from working at an occupation which brings him an income constitutes total disability."

The commission refused to accept employee's argument that § 176.101, subd. 5, applied and held Minn. St. 1953, § 176.101, subd. 3(43), applicable. That provision states:

"In cases of permanent partial disability caused by simultaneous injury to two or more members, the applicable schedules in this subdivision shall be increased by 15 percent. * * * In cases of partial

disability due to injury to both eyes resulting in less than total loss of vision in one or both eyes compensation shall be paid at the prescribed rate during that part of 400 weeks which the extent of the combined injury to both eyes bears to the complete loss of industrial vision."

Par. (43) was amended in L. 1957, c. 781, § 4, to change 400 weeks to 450 weeks.

The commission awarded compensation as follows:

"Now, THEREFORE, * * * George Yureko, the employee herein, is entitled to and hereby is awarded against the above employer and insurer, a total compensation of $15,925.00, covering temporary total disability for 55 weeks * * *; 400 weeks of permanent partial disability * * * for 100 percent loss of use of each eye under M.S. 1953, Sec. 176.101 (43), and in addition thereto payment of all medical expenses * * * together with payment for future medical care and attention, with costs and disbursements as provided by law * * *."

■ It seems clear that the controversy resolves itself into the distinction between loss of industrial vision and permanent total loss of vision. Respondents concede that with an uncorrected vision of less than 20/200, employee has complete loss of industrial vision in both eyes, but contend that this does not necessarily mean that employee has total loss of vision. If there is less than total loss of vision the provisions of Minn. St. 1953, § 176.101, subd. 3(43), apply, even though employee has complete loss of industrial vision. Since the employee does not have a total loss of sight of both eyes, and his vision is corrected with glasses to 20/20 in each eye, he does not qualify under Minn. St. 176.101, subd. 5, for benefits paid to one who is permanently totally disabled. It is clear, however, that if employee's ability to earn later diminishes into permanent total disability he is free to petition for such further benefits as he may then be entitled to.

■ We have been referred to Butch v. Shaver, 150 Minn. 94, 184 N. W. 572; Foster v. Schmahl, 197 Minn. 602, 268 N. W. 631; and Livingston v. St. Paul Hydraulic Hoist Co. 203 Minn. 62, 279 N. W. 829. In the Butch case it was held that an employee who sustained an injury by accident arising out of and in the course of her

employment which irrecoverably destroyed the sight of her right eye was entitled to compensation for the loss of the eye although with extra artificial means she might have had fair vision. The Workmen's Compensation Act then in force provided that in cases of permanent partial disability it should be considered that the permanent loss of the use of a member was equivalent to the loss of that member. This court affirmed the district court's award to employee, stating that compensation would not be diminished by reason of the fact that the disability might in a measure be overcome by artificial means.

In the Foster case this court reviewed an order of the Industrial Commission denying employee compensation for total permanent disability. The employee in that case claimed that as a result of two injuries to his eyes he became permanently totally disabled. It was conceded that he was partially disabled due to the injuries and also that he had received compensation therefor. The statute in effect at that time defining total disability was identical to Minn. St. 176.101, subd. 5.

We held in the Foster case that in determining the extent of injuries occasioned to the vision as the result of an industrial accident, correction by glasses may be taken into consideration. While the employee was, without glasses, industrially blind for all practical purposes, the testimony of the medical experts indicated that his vision could be so corrected by glasses that he would have acceptable vision and be able to perform normal labor as a janitor, his occupation at the time of the accident. The testimony of the medical experts, while conflicting, indicated that he did not have a permanent total loss of vision. This court said (197 Minn. 604, 268 N. W. 632):

"* * * A large percentage of our populace, both in the professions and in the trades, must resort to the use of glasses even in the normal course of events in order to enable them to carry on their work. Such people are not totally disabled by any means. There can be no plausible reason for so considering a person who has been forced to wear glasses as the result of an industrial accident. * * *

"It is insisted that this court in Butch v. Shaver, 150 Minn. 94, 184 N. W. 572, adopted the rule that 'compensation for the loss of

vision should be determined without resort to correction by glasses.' We do not so construe the holding of that case. In it this court only sustained a finding of the trial court that there was a total loss of vision of one eye. *If there be an implication of the adoption of the foregoing quoted rule, this court now must depart therefrom.*" (Italics supplied.)

In the Livingston case the employee had in the course of his employment sustained an injury to his right eye. The employer paid compensation for several months as well as medical and hospital benefits. Later, however, employer's insurer served notice of discontinuance of payments and the proceeding involved followed. The referee found the employee had suffered a 75-percent permanent partial disability and awarded compensation on that basis, and the Industrial Commission affirmed the decision of the referee. The medical findings were not in dispute; it was agreed that employee had 20/100 vision in his right eye and by the use of glasses this could be improved to 20/20 or normal vision. The controversy had to do with whether in computing an award for a fractional loss of vision such award should be based on the percentage of loss without the use of glasses, or whether it should be based on the percentage of loss when such vision is aided by means of a corrective lens. We stated in that case (203 Minn. 63, 279 N. W. 830):

"* * * Since its creation in 1921, the commission has always rated disability without reference to correction by the use of glasses or other artificial device. In doing so it has relied upon the decision of this court in Butch v. Shaver, 150 Minn. 94, 97, 184 N. W. 572, 573. * * *

"Relators' hope of establishing a different basis for fixing disability in eye cases is apparently founded upon the decision of this court in Foster v. Schmahl, 197 Minn. 602, 268 N. W. 631. That case involves a construction of 1 Mason Minn. St. 1927, § 4274(e), which defines total and permanent disability. * * *

"The commission found that the injured employe was not totally and permanently disabled, and this court sustained that determination. The cases are not in conflict, for the former involved a specific in-

jury to a member while the latter involved a lessened earning ability.

"A determination as to whether the legislature, when it enacted the compensation act, intended that corrective devices be taken into consideration in fixing the extent of eye disability requires an examination of subds. 21 and 41, 1 Mason Minn. St. 1927, § 4274(c). Subd. 21 reads:

" 'For the loss of an eye, sixty-six and two-thirds per centum of the daily wage at the time of injury during one hundred (100) weeks.'

"Subd. 41 reads:

" 'In cases of permanent partial disability due to injury to a member, resulting in less than total loss of such member not otherwise compensated in this schedule, compensation shall be paid at the prescribed rate during that part of the time specified in the schedule for the total loss of the respective member, which the extent of injury to the member bears to its total loss.'

"We see nothing in the act indicating an intention on the part of the legislature that disability after correction is to be the basis for awarding compensation where there has been an eye injury."[1]

The court suggested that if the act was faulty the correction should be made by the legislature and not by the court.

The foregoing cases were commented upon by the Nebraska Supreme Court in Otoe Food Products Co. v. Cruickshank, 141 Neb. 298, 304, 3 N. W. (2d) 452, 455, 142 A. L. R. 816, where that court said:

"* * * While an apparent conflict seems to exist in the Minnesota court's determination of the question, it is quite evident that the circumstances, as disclosed by each case, governed the court's decision."

See Lambert v. Industrial Comm. 411 Ill. 593, 104 N. W. (2d) 783, also, for a discussion of the above Minnesota cases.

In Miller v. Mutual Life Ins. Co. 206 Minn. 221, 226, 289 N. W. 399, 401, 126 A. L. R. 129, involving the recovery of disability benefits under life insurance policies, this court said:

---

[1]Minn. St. 176.101, subd. 3(21) and (42), are comparable to the quoted provisions.

"In workmen's compensation cases, the object of the law is to provide benefits to the injured employe during disability irrespective of the employer's fault. The law does not contemplate benefits if the employe can be restored to industrial capacity. This is the rationale of Foster v. Schmahl, 197 Minn. 602, 268 N. W. 631, wherein it was held that a workman who was industrially blind without glasses was not totally disabled, since by the use of them the disability could be removed."

It is clear upon analysis of Butch v. Shaver, *supra*, Foster v. Schmahl, *supra*, and Livingston v. St. Paul Hydraulic Hoist Co. *supra*, that the determination of the particular fact issues in each case was largely based upon the statute involved. We agree with the decision of the Industrial Commission that in the instant case the applicable statute is Minn. St. 1953, § 176.101, subd. 3(43). That subdivision disposes of the apparent conflict which seemed to exist in the foregoing decisions.

In determining the extent of injuries to vision resulting from an industrial accident, correction by glasses may be taken into consideration. Foster v. Schmahl, *supra*.

■ Where qualified medical experts differ, as they do in the instant case, it is not for this court to say that one is so eminently right and the other so clearly wrong that the factfinder should accept the opinion of one and discard that of the other. It is for the Industrial Commission to determine conflicts in the medical testimony as well as conflicts generally involving questions of fact. The determination of the fact questions must depend to a large extent upon the credibility attached by the trier of facts to the testimony of the various witnesses. Golob v. Buckingham Hotel, 244 Minn. 301, 69 N. W. (2d) 636. In this case we think the findings of the commission are adequately supported by the record.

Following the submission of this case the commission considered the appointment of an impartial physician under Minn. St. 176.391, and in endeavoring to secure one, a member of the commission talked to an ophthalmologist at a leading medical clinic. Although he did not serve as an impartial physician, this ophthalmologist sent a letter to

the commission following the interview, in which he expressed an opinion favorable to employee as follows:

"The man in question is too young for ordinary senile cataracts which are common in the elderly. Some specific cause must have obtained. In the absence of any other proven cause I would be forced to attribute his cataracts to the heat."

Employee moved to make this letter a part of the transcript for the consideration of the commission on appeal, citing Bushnell v. City of Duluth, 241 Minn. 189, 62 N. W. (2d) 813. The commission did not believe that case was authority for saying that the letter constitutes evidence and pointed out that respondents had had no opportunity to cross-examine and that the letter was never intended as evidence. The commission took the view that their determination was sustained by other competent evidence and did not consider the letter in making it.

■ This court reviews only questions of law presented by the record. It cannot make findings of fact or determine questions of fact. The determination of questions of fact is for the commission. In determining whether the evidence sustains the commission's findings of fact, it is the findings of the commission, not the referee, that are before the court. The findings of the commission are entitled to very great weight, and this court will not disturb them unless they are manifestly contrary to the evidence.[2] We reach the conclusion that the commission has properly interpreted and applied the statutory law and that their determination of the facts finds ample support in the record.

Affirmed.

---

[2]See, 21 Dunnell, Dig. (3 ed.) § 10426(13).