Denise WESTPHAL, Plaintiff-Appellant,†

HOME INSURANCE COMPANY, Involuntary-Plaintiff,

v.

E.I. DU PONT DE NEMOURS & COMPANY, INC., a foreign corporation, Defendant-Respondent,

DOW CORNING CORPORATION, a foreign corporation, Vitek, Inc., St. Paul Fire & Marine Ins., Co., a foreign insurance corporation, Steven Sewall, D.D.S., Eugene Messer, D.D.S., Defendants,

Joseph LITOW, D.D.S., Defendant-Respondent.

Court of Appeals

*No. 93–2493. Oral argument November 18, 1994.—Decided March 2, 1995.*

(Also reported in 531 N.W.2d 386.)

†Petition to review filed.

For the plaintiff-appellant the cause was submitted on the briefs of and oral argument by *Raymond E. Schrank, II* of *Cannon & Dunphy, S.C.* of Milwaukee.

For the defendant-respondent, E.I. du Pont de Nemours & Co., Inc., the cause was submitted on the briefs of *Richard A. Hollern* of *Stafford, Rosenbaum, Rieser & Hansen* of Madison, *Ross F. Schmucki* of *E.I. du Pont de Nemours & Co., Inc.* of Willmington, Delaware, and *Barry Fish, Edward M. Mansfield* and *Bret A. Maidman* of *Lewis & Roca* of Phoenix, Arizona, and

orally argued by *Richard A. Hollern* and *Edward M. Mansfield.*

For the defendant-respondent, Joseph Litow, D.D.S., the cause was submitted on the brief of *Paul R. Erickson* and *Colleen M. Fleming* of *Cutglass, Erickson & Bonville, S.C.* of Milwaukee, and orally argued by *Paul R. Erickson.*

For the plaintiff-appellant, an *amicus curiae* brief was submitted by *David M. Skoglind* of the *Wisconsin Academy of Trial Lawyers* of Milwaukee.

Before Gartzke, P.J., Dykman and Sundby, JJ.

DYKMAN, J. Denise Westphal appeals from judgments granting summary judgment motions by E.I. du Pont de Nemours & Company, Inc., and Dr. Joseph Litow, dismissing her complaint. Westphal argues the trial court erred in concluding, as a matter of law, that du Pont was not responsible for her injuries under theories of strict liability and negligence. Westphal alleges she was injured by Teflon[1] supplied by du Pont and contained in a temporomandibular joint (TMJ) implant manufactured by Vitek, Inc., which was surgically placed in her jaw. Westphal also contends the trial court erred when it dismissed her claim against Dr. Litow because the statute of limitations had run. We conclude that because the Teflon was substantially altered by Vitek and Westphal failed to show that du Pont knew or should have known that Teflon was dangerous as used in the TMJ implant, du Pont is not responsible, as a matter of law, under either a strict liability or negligence theory. We also conclude that

---

[1] Teflon is the trade name for polytetrafluoroethelene (PTFE).

Westphal's negligence action against Dr. Litow was untimely commenced. Consequently, we affirm.

## BACKGROUND

### 1. Development of the Temporomandibular Joint Interpositional Implant

In the late 1960's, Dr. Charles Homsy, a former employee of du Pont, became interested in creating medical implants after his daughter was born with a congenital hip defect. He developed a material called Proplast, which he believed would greatly improve the attachment of implants to the body. Proplast consists of several substances, including Teflon. Teflon is manufactured exclusively by du Pont and has a wide variety of commercial and industrial uses. Proplast is a spongy material which is made by combining Teflon with other materials, including carbon fibers and sodium chloride, and subjecting them to an eight-step manufacturing process. The process changes Teflon's physical properties. While Teflon is hard, slippery, nonabsorbent and solid, Proplast is semisoft, absorbent, spongy, and highly porous. Dr. Homsy obtained a patent for Proplast in 1976.

Du Pont knew that Dr. Homsy intended to use Teflon for medical uses. When Dr. Homsy sought to purchase Teflon in 1967, du Pont informed him that Teflon is an industrial grade product not manufactured for medical use. Du Pont stated that while it conducted tests to protect the ordinary users of its product, it did not perform the studies necessary to determine if Teflon was appropriate for medical and surgical uses. Du Pont stated that it was reluctant to sell Teflon to Dr. Homsy, noting the mixed results obtained in earlier attempts to use Teflon in medical implants. Du Pont

agreed to sell Teflon to Dr. Homsy if he would study the appropriateness and safety of Teflon in medical implants. Dr. Homsy agreed.

Dr. Homsy founded Vitek, Inc., in 1969 to design, manufacture and sell medical devices. Vitek performed studies and determined that Teflon was a useful implant material. Du Pont again contacted Vitek in 1977 and reiterated its concerns about using Teflon in implants. Du Pont never approved the use of Teflon in medical implants.

In 1983, the United States Food and Drug Administration (FDA) authorized the sale of Vitek's TMJ Interpositional Implant. The TMJ implant was made with Proplast and fluorinated ethylene propylene (FEP). Over the years, du Pont made several sales of Teflon to Vitek in bulk form, supplied in containers of fifty pounds or more. Du Pont had no other relationship with Vitek and was not involved in the design, manufacture or sale of Vitek's products.

## 2. *Westphal's Medical History*

Westphal alleges that in November 1982, Dr. Joseph Litow, an oral and maxillofacial surgeon, negligently performed a surgery to repair her left TMJ. In October 1983 and March 1984, Dr. Litow inserted Silastic implants in her left and right TMJ's. Westphal's last visit with Dr. Litow was in October 1984.

The Silastic implants were removed in December 1984 by Dr. Eugene Messer and replaced with Proplast implants manufactured by Vitek. In January 1986, Dr. Steven Sewall, who took over Dr. Messer's practice, removed the Proplast implants because they were fragmenting and replaced them with temporary Silastic implants. These Silastic implants were removed in

July 1986 by Dr. Sewall. He performed two further operations in June 1987.

Westphal commenced suit to recover damages for injuries she claims resulted from medical malpractice on the part of her physicians and on theories of strict liability and negligence on the part of the TMJ implant manufacturers. Westphal claims, among other things, that the bones around her jaw have eroded and an opening has developed exposing her brain. The trial court dismissed Westphal's claims against du Pont and Dr. Litow on summary judgment motions. This appeal followed.

## STANDARD OF REVIEW

We review a grant of summary judgment *de novo* by applying the same standards as employed by the trial court. *Brownelli v. McCaughtry*, 182 Wis. 2d 367, 372, 514 N.W.2d 48, 49 (Ct. App. 1994). We first examine the complaint to determine whether it states a claim, and then the answer to determine whether it presents a material issue of fact. *Id.* If they do, we then examine the evidence offered by the moving party to determine whether that party has established a *prima facie* case for summary judgment. *Id.* If the moving party has, we then look to the opposing party's evidence to determine whether there are any material facts in dispute which entitle the opposing party to a trial. *Id.* at 372-73, 514 N.W.2d at 49-50.

## DU PONT'S LIABILITY

### 1. Strict Liability

Westphal contends the trial court erred when it ruled, as a matter of law, that du Pont was not respon-

sible under a theory of strict liability. According to Westphal, her experts' opinions have raised factual issues as to whether the Teflon was defective or unreasonably dangerous and whether the Teflon was substantially changed by Vitek. We disagree.

Westphal's complaint states a claim for liability under theories of strict liability and negligence. Du Pont's answer presents a material issue of fact in that it denies any responsibility for her injuries. We next examine the evidence offered by du Pont in support of its motion to determine whether it has made a *prima facie* case for summary judgment. If so, we examine Westphal's evidence to see if any disputed facts remain entitling her to a trial.

Wisconsin adopted RESTATEMENT (SECOND) OF TORTS 402A (1965), imposing strict liability on sellers or manufacturers of products, in *Dippel v. Sciano*, 37 Wis. 2d 443, 459, 155 N.W.2d 55, 63 (1967). Section 402A provides,

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
> (a) the seller is engaged in the business of selling such a product, and
> (b) *it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.*
> (2) The rule stated in Subsection (1) applies although
> (a) the seller has exercised all possible care in the preparation and sale of his product, and
> (b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

(Emphasis added.)

Thus, to make a manufacturer strictly liable, the plaintiff must show the following elements:

> (1) that the product was in defective condition when it left the possession or control of the seller, (2) that it was unreasonably dangerous to the user or consumer, (3) that the defect was a cause (a substantial factor) of the plaintiff's injuries or damages, (4) that the seller engaged in the business of selling such product . . . and (5) *that the product was one which the seller expected to and did reach the user or consumer without substantial change in the condition it was [in] when he sold it.*

*Dippel,* 37 Wis. 2d at 460, 155 N.W.2d at 63 (emphasis added).

Focusing on the fifth element only, the trial court determined that the Teflon had been substantially altered by Vitek, relieving du Pont of strict liability as a matter of law. A component manufacturer is not responsible under a theory of strict liability when its product has undergone a substantial change by another. *Shawver v. Roberts Corp.*, 90 Wis. 2d 672, 684-86, 280 N.W.2d 226, 232-33 (1979). "A substantial and material change is a change in the design, function or character of the product linked to the accident." *Glassey v. Continental Ins. Co.*, 176 Wis. 2d 587, 600, 500 N.W.2d 295, 301 (1993). Whether a change is substantial and material to an accident may be a jury question, but when the facts are undisputed and permit only one inference, the complaint may be dismissed as a matter of law. *Id.* at 605, 500 N.W.2d at 303.

Imposing strict liability on manufacturers ensures "that the risk of loss associated with the use of defective products should be *borne by those who have created the risk and who have reaped the profit by placing a defective product in the stream of commerce.*" *Kemp v. Miller*, 154 Wis. 2d 538, 556, 453 N.W.2d 872, 879 (1990) (emphasis added). Just as a seller who has neither created nor assumed the risk of loss from the use of a defective product is entitled to indemnity from the manufacturer, a supplier who sells a nondefective product to another manufacturer is not strictly liable. *Id.* Consequently, we shift responsibility from the component supplier to the manufacturer who has substantially altered a product. *See City of Franklin v. Badger Ford Truck Sales, Inc.*, 58 Wis. 2d 641, 649, 207 N.W.2d 866, 869-70 (1973). In so doing, we recognize that strict liability is intended to impose liability upon the party in the best position to control the risk of harm a product might cause. *Glassey*, 176 Wis. 2d at 602-03, 500 N.W.2d at 302.

Thus, in *Franklin*, 58 Wis. 2d at 648-50, 207 N.W.2d at 869-70, the court concluded that when a component itself was defective and below manufacturer's specifications, liability would not shift from the manufacturer of that component. However, in *Shawver*, 90 Wis. 2d at 684-86, 280 N.W.2d at 232-33, we concluded that a conveyor belt manufacturer would not be liable when its product was not defective but was combined with a defective control system. Likewise, in *Glassey*, 176 Wis. 2d at 605, 500 N.W.2d at 303, we concluded, as a matter of law, that when a buyer put a non-standard replacement cap on a spray tank, the buyer had substantially and materially altered the

product thereby relieving the spray tank manufacturer of strict liability.

■

Westphal contends there is a factual dispute over whether the Teflon was substantially changed. We conclude, however, that when a manufacturer subjects a component to an eight-step patented manufacturing process and the physical properties of that component are physically changed, that product has been substantially changed as a matter of law. That there may be traces of Teflon in Westphal's body does not persuade us otherwise. A product need not be completely obliterated or undergo a chemical transformation to be substantially changed, rather we look at whether the product has been combined with another or treated in such a manner that renders it substantially and materially different from its condition when it left the control of its manufacturer. *Id.* at 600, 500 N.W.2d at 301. Vitek's eight-step manufacturing process resulted in a substantial and material change in the design, function and character of the Teflon. As a component supplier, du Pont had no control over the design or manufacture of Vitek's TMJ implant. Vitek's TMJ implant is a highly specialized product. Public policy is best served by shifting liability from du Pont in this situation.

■

Westphal also argues that the Teflon was unreasonably dangerous when used in TMJ implants thus imposing a duty to warn upon du Pont. The duty to warn arises in strict liability cases only when the seller of a product has, or should have, knowledge of a dangerous use. *Krueger v. Tappan Co.*, 104 Wis. 2d 199, 206-07, 311 N.W.2d 219, 223 (Ct. App. 1981).

> A product is not in a defective condition when it is safe for normal handling and consumption. . . . Where, however, [a seller] has reason to anticipate that danger may result from a particular use . . . [the seller] may be required to give adequate warning of the danger . . . and a product sold without such warning is in a defective condition.

RESTATEMENT (SECOND) OF TORTS 402A cmt. h (1965) (*cited in Krueger*, 104 Wis. 2d at 206-07, 311 N.W.2d at 223). "In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use." RESTATEMENT (SECOND) OF TORTS 402A cmt. j (1965).

Westphal does not allege that Teflon is inherently dangerous or unsafe. Rather, she alleges that when used in the TMJ implant, it became unreasonably dangerous. However, this allegation is based upon an assumption that Teflon is inherently defective and unsafe. That the Proplast implant might be causally related to her injuries, does not make the Teflon inherently dangerous. Du Pont made no representations to Vitek as to whether Teflon would be safe for use in medical implants but only that the Teflon supplied to Vitek was inherently safe for industrial uses. And Vitek explained to du Pont that the Teflon would undergo a manufacturing process before it would be used in the TMJ implant. It was Vitek's inappropriate use of Teflon that caused it to become dangerous. Thus, we turn to a negligence analysis to determine if summary judgment was proper.

## 2. Negligence

Westphal alleges there is a genuine issue of material fact as to whether du Pont knew or should have known that Teflon was unreasonably dangerous when used in TMJ implants. According to Westphal, du Pont had a duty to warn either herself or oral surgeons of the potential risks involved in using Teflon in a TMJ implant. Consequently, she argues the trial court erred when it granted du Pont's motion for summary judgment. We disagree.

To recover under a negligence theory, Westphal must show: (1) the existence of a duty of care on the part of the defendant; (2) a breach of that duty; (3) a causal connection between the conduct and plaintiff's injury; and (4) that damages resulted from the injury. *Coffey v. City of Milwaukee*, 74 Wis. 2d 526, 531, 247 N.W.2d 132, 135 (1976). Whether summary judgment was appropriate turns on whether du Pont owed a duty to Westphal. This is a legal issue we decide *de novo. Id.*

The concept of duty is inexorably intertwined with the concept of foreseeability. *Id.* at 537, 247 N.W.2d at 138. The supreme court has stated,

> The duty of any person is the obligation of due care to refrain from any act which will cause foreseeable harm to others even though the nature of that harm and the identity of the harmed person or harmed interest is unknown at the time of the act.
>
> . . . .
>
> A defendant's duty is established when it can be said that it was foreseeable that his act or omission to act may cause harm to someone. A party is negligent when he commits an act when some harm to someone is foreseeable. Once negligence is estab-

lished, the defendant is liable for unforeseeable consequences as well as foreseeable ones. In addition, he is liable to unforseeable plaintiffs.

*A.E. Inv. Corp. v. Link Builders, Inc.*, 62 Wis. 2d 479, 483-84, 214 N.W.2d 764, 766 (1974) (citations omitted). Consequently, the existence of a duty turns on whether the defendant's behavior "forseeably created an unreasonable risk to others." *Coffey*, 74 Wis. 2d at 537, 247 N.W.2d at 138 (quoting *Antoniewicz v. Reszczynski*, 70 Wis. 2d 836, 857, 236 N.W.2d 1, 11 (1975)).

RESTATEMENT (SECOND) OF TORTS 388 (1965), was adopted in Wisconsin in *Vogt v. S.M. Byrne Constr. Co.*, 17 Wis. 2d 96, 99, 115 N.W.2d 485, 486-87 (1962), *modified*, 17 Wis. 2d 96, 117 N.W.2d 362 (1962). Section 388 governs a product manufacturer's duty to warn in negligence actions and provides:

> One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by its probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
>
> (a) *knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied,* and
>
> (b) has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition, and
>
> (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be dangerous.

(Emphasis added.) Comment L states with regard to clause (c):

The supplier's duty is to exercise reasonable care to inform those for whose use the article is supplied of dangers which are peculiarly within his knowledge. If he has done so, he is not subject to liability, even though the information never reaches those for whose use the chattel is supplied.

Westphal has presented no evidence that du Pont knew or should have known that using Teflon in this particular manner would be dangerous. Westphal argues that du Pont was aware of earlier medical studies indicating that Teflon was inappropriate for use in hip implants, but when du Pont brought those studies to Vitek's attention, Vitek distinguished them explaining they were not determinative of whether Teflon was inappropriate, when made into Proplast, for use in TMJ implants.

Westphal also points to a du Pont employee's memorandum as evidence of du Pont's knowledge. In 1984, the employee, Michael Bernhardt, attended a conference for oral surgeons where TMJ implants were discussed by some twenty-three speakers. Bernhardt's memorandum provides brief summaries of the speakers' statements. Of the twenty-three speakers, only three spoke less than favorably about use of the Proplast TMJ implant.

According to the memorandum, Dr. William McCarty discussed his desire for better biomaterials for TMJ implants. Bernhardt wrote that Dr. McCarty believed that "the 'Proplast' and 'Silastic' and metal prostheses they are using today simply do not do the job." Bernhardt's summary of Dr. Bruce Sanders's speech concerning surgical failure states, "Several reasons were listed for surgical failure. Biggest problems with 'Proplast' or 'Silastic' is using too big or thick a prosthesis or not affixing it properly. 'Proplast' is very

difficult to remove due to its tendency to fracture into many pieces into which natural tissue grows." And, Bernhardt's summary of Dr. Richard Akin's speech on TMJ reconstruction materials noted Proplast's benefits, but reported that its potential problems included "perforation or disintegration—deteriorates rapidly," infections and a potential for "mechanical failure—material may become folded with function of condyle." Of the remaining twenty speakers, Dr. Ted Kiersch indicated that ninety-three percent of his patients had some degree of improvement with the Proplast TMJ implant. In particular, Dr. Kiersch stated the advantages of Proplast included that it was inert, promoted tissue ingrowth, is easily shaped, easily compressible, and has low friction due to the Teflon surface. And, according to Bernhardt, Dr. Homsy's speech described how Proplast was manufactured and explained that it was "a good candidate for long-term success." Bernhardt's memorandum does not indicate that any of the remaining speakers discussed Proplast TMJ implants specifically.

The evidence does not show that du Pont knew or had reason to know that the use of Teflon in medical implants was dangerous. Du Pont did not know what effect Teflon would have on patients once it was combined with other products and made into Proplast and subsequently used in the TMJ implant. The Bernhardt memorandum does not indicate that any of the speakers were referring to Vitek's product specifically. Moreover, most of the information in the memorandum concerning TMJ implants was positive. Bernhardt's memorandum does not show that du Pont knew or should have known of any danger caused by Teflon. As a policy matter, it would be unreasonable and impracti-

cal to require du Pont to have intimate knowledge of all uses of all products made with Teflon especially when du Pont has a limited financial interest. Accordingly, du Pont has no liability.

## DR. LITOW

Westphal contends the trial court erred when it dismissed her claim against Dr. Litow as untimely. According to Westphal, under the doctrine of continuous negligent care, the statute of limitations begins to run when the last negligent act occurred, in June 1987. Because she discovered her claim in April or May 1990, she argues that her amended complaint naming Dr. Litow as a defendant was timely commenced in October 1990. We disagree.

Westphal's complaint states a cause of action against Dr. Litow. It alleges that Dr. Litow's medical care was negligent and that his negligence caused her to undergo additional surgeries leading to her injuries. Dr. Litow's answer raises a material issue of fact. He claims he was not negligent and Westphal's action against him was not timely commenced.

The affidavits submitted in support of Dr. Litow's summary judgment motion establish a *prima facie* case for summary judgment. Dr. Litow avers that Westphal's action against him is barred by the applicable statute of limitations. Timely commencement of Westphal's action against him is controlled by § 893.55(1)(b), STATS.[2] Section 893.55(1)(b) modifies the discovery rule in that the statute of limitations begins

---

[2] Section 893.55(1), STATS., provides:

Except as provided by subs. (2) and (3), an action to recover damages for injury arising from any treatment or operation performed by, or from any omission by, a person who is a health care

to run on the date when the injury is discovered or should have been discovered, but, in any event, permits no party to bring an action more than five years after the date upon which the act occurred out of which the cause of action arose.

■■■■■■

Whether Westphal's action was timely commenced against Dr. Litow turns on whether she received continuous negligent care. When continuous negligent treatment has been provided, the statute of limitations begins to run from the last date of negligent conduct. "[W]here it is alleged and where affidavits on summary judgment state that there is a continuing course of negligent treatment, there exists a single cause of action in relation to which the statute of limitations does not begin to run until the entire course of conduct ceases." *Clark v. Erdmann*, 161 Wis. 2d 428, 443, 468 N.W.2d 18, 24 (1991) (citing *Tamminen v. Aetna Casualty and Sur. Co.*, 109 Wis. 2d 536, 558, 327 N.W.2d 55, 65 (1982)). The continuous negligent treatment rule applies when the plaintiff is treated by one or more actors. *Robinson v. Mount Sinai Medical Ctr.*, 137 Wis. 2d 1, 20-21, 402 N.W.2d 711, 719 (1987). The cause of action accrues on the date of the last negligent act when the plaintiff shows: (1) a continuum of care; (2) a continuum of negligent medical care; (3) that the medical care is related to a single condition; and (4) the

provider, regardless of the theory on which the action is based, shall be commenced within the later of:

 (a) Three years from the date of the injury, or

 (b) One year from the date the injury was discovered or, in the exercise of reasonable diligence should have been discovered, except that an action may not be commenced under this paragraph more than 5 years from the date of the act or omission.

precipitating factor in the continuum is the original negligent act.[3] *Id.* at 28-29, 402 N.W.2d at 722.

We focus on the second element. The test for whether negligent medical care was continuous is "whether a lay person could reasonably conclude that the facts fall within a single unit or occurrence." *Id.* at 27, 402 N.W.2d at 722. We must determine whether the actions alleged to be negligent are sufficiently related in time and sequence to constitute a continuous course of negligence. *Id.* at 28-29, 402 N.W.2d at 722.

The continuous negligent treatment doctrine was adopted in *Tamminen*. In *Tamminen*, the plaintiff alleged her physicians had negligently treated her in connection with gastric bypass surgery from November 1975 through March 1976. The plaintiff commenced her action in January 1980 and the physicians argued that the applicable statute of limitations had run. The *Tamminen* court applied the rule and determined there was a disputed issue as to the last date of negligence because the plaintiff stated particular acts and omissions of negligence throughout the treatment period. *Tamminen*, 109 Wis. 2d at 558-60, 327 N.W.2d at 65-66. The court reasoned that whether a continuum of negligent conduct exists is identical to the rationale utilized in determining whether there is a single cause

---

[3] The doctrine of continuous negligent treatment is not to be confused with the doctrine of continuous treatment. Wisconsin has rejected the doctrine of continuous treatment which provides that if there has been negligence and the negligent health care provider continues to treat the plaintiff for the condition resulting from the negligence, the statute of limitations runs from the last day the plaintiff was treated for that condition. *Robinson v. Mount Sinai Medical Ctr.*, 137 Wis. 2d 1, 13-14, 402 N.W.2d 711, 716 (1987).

of action in misjoinder cases. *Id.* at 557, 327 N.W.2d at 64-65.

In *Robinson*, the plaintiff was a sixteen-year-old boy who went to Mount Sinai Medical Center emergency room in January 1979 complaining of a toothache and frontal headache. A resident examined the boy and allegedly misdiagnosed the problem. The boy was sent home and his condition deteriorated. Three days later, he returned to Mount Sinai and was examined by another physician who was also on staff at Milwaukee Children's Hospital. The boy was admitted to Children's Hospital and underwent four neurosurgical procedures over the next few months, the last occurring on April 11, 1979. He also underwent other procedures and had a shunt inserted into his head. The boy was discharged from Children's Hospital in September 1979 and sent to a third hospital. An infection spread to the boy's head causing severe brain damage. The boy sued Mount Sinai in May 1984.

Mount Sinai moved for summary judgment arguing that the cause of action was barred by the applicable statute of limitations. In concluding that there was an issue of fact as to whether there was a continuous course of negligent treatment, the court focused on the affidavits submitted in support of the boy's motion. *Robinson*, 137 Wis. 2d at 18-20, 402 N.W.2d at 718. An expert opined that the boy's injuries began with the alleged misdiagnosis made by the Mount Sinai resident. *Id.* at 19, 402 N.W.2d at 718. The court also looked at the fact that the boy had a spreading infection that grew progressively worse and was improperly treated by the resident at Mount Sinai. *Id.* at 28-29, 402 N.W.2d at 722. From this, the court concluded, "that the record sets forth a case in which the *Tamminen* rule should apply. The facts as averred

by Plaintiffs evince a situation 'where there is a continuum of negligent medical care related to a single condition occasioned by negligence.' " *Id.* at 20, 402 N.W.2d at 719 (quoting *Tamminen*, 109 Wis. 2d at 556, 327 N.W.2d at 64). The court explained, "[s]ince the rule is applied and we assume the facts are as Plaintiffs aver, the Defendants cannot prevail on their statute of limitations argument." *Id.*

Additionally, the court relied on the concept of cause of action as analyzed in the misjoinder cases to determine if a continuum of negligent medical treatment existed. *Id.* at 26-28, 402 N.W.2d at 721-22. Those cases "define a cause of action as 'a grouping of facts falling into a single unit or occurrence as a lay person would view them.' " *Id.* at 26, 402 N.W.2d at 721 (quoted source omitted). The court explained:

> In relying on the single "cause of action" notion to aid our continuum of negligent treatment analysis, we are not concerned with the number of defendants or the number of wrongful acts. In this respect, the analysis in continuum of negligent medical treatment cases differs from the analysis in the misjoinder cases. Our concern is with the question whether a lay person could reasonably conclude that the facts fall within a single unit or occurrence. The implied assumption is that this will function as a test in helping to determine whether the events can be characterized as forming a *"continuum"* of negligent treatment.

*Id.* at 27, 402 N.W.2d at 722.

In *Clark*, the patient, Clark, alleged that her physician, Dr. Erdmann, negligently treated her feet in 1981. Clark continued to have trouble with her feet and was treated by another doctor in April 1982 and a third in December 1983 and April 1984. Clark went back to

Dr. Erdmann in April 1984 and saw him several times that year, the last visit being in August 1984. Clark commenced her suit against him in February 1987. In declining to apply the doctrine of continuous negligent care, the supreme court concluded, "there is no evidence put forth by Clark to suggest that any negligent act or omission occurred after 1981. Accordingly, we hold as a matter of law that the alleged negligent treatment by Dr. Erdmann was not continued into 1984. No reasonable fact-finder could conclude to the contrary." *Clark*, 161 Wis. 2d at 444, 468 N.W.2d at 24.

We do not think that the facts in *Tamminen* and *Robinson* are sufficiently similar to warrant the application of the doctrine in this case. While the doctrine was developed out of the law regarding what constitutes a cause of action in misjoinder cases, it implicates the law developed around statute-of-limitations periods. Defendants have a constitutional right to rely upon statutes of limitations to limit the claims against them. *Haase v. Sawicki*, 20 Wis. 2d 308, 311-12, 121 N.W.2d 876, 878 (1963). *See also Borello v. U.S. Oil Co.*, 130 Wis. 2d 397, 415-16, 388 N.W.2d 140, 147-48 (1986) (once a statute of limitations has run, the party relying on the statute has a vested property right in the statute-of-limitations defense, and a new law which changes the period of limitations cannot be applied retroactively to extinguish the right). The longer we extend that period, the more the right is abridged. The legislature has limited the discovery rule in medical malpractice claims. *See* § 893.55(1)(b), STATS. We believe that a doctrine implicating the legislature's express dictates should be applied in limited circumstances. Therefore, we conclude that the amount of time that has passed between each allegedly negligent

act is necessarily a primary factor in determining whether there has been a continuum of negligent treatment for the purposes of extending a limitations period.

Westphal has failed to show in her affidavits the existence of a continuous course of negligent medical care making her claim timely as to Dr. Litow. Westphal's expert, Dr. William Irby, averred that Dr. Litow's decision to operate on Westphal on November 10, 1982, was negligent and that Dr. Litow should have first attempted more conservative, nonsurgical treatments. Dr. Litow inserted Silastic implants in Westphal's left and right TMJ's in October 1983 and March 1984. Dr. Irby opined that the decision to insert the right Silastic implant in March 1984 was inappropriate, but does not aver that either the October 1993 or the March 1984 operation was negligently performed. *See Zintek v. Perchik*, 163 Wis. 2d 439, 457, 471 N.W.2d 522, 529 (Ct. App. 1991) (evidence that another physician might have acted differently and that there were alternate procedures available is not, standing alone, evidence of medical negligence). Dr. Irby opined that the next negligent procedure occurred more than two years later when, on December 13, 1984, Dr. Messer replaced Westphal's Silastic implants with Proplast implants. According to Dr. Irby, the next negligent acts occurred more than two-and-one-half years later, when in June 1987, Dr. Sewall performed two additional surgical procedures.

We conclude that the allegedly negligent treatment was not continuous. While all of Westphal's medical care related to her TMJ problems, there was a two-year gap between the allegedly negligent treatment by Dr. Litow and the next time Westphal was

374

allegedly negligently treated. Thus, Westphal's claim against Dr. Litow began to run on November 10, 1982, the first and only date she alleges he was negligent.[4]

Westphal also argues the trial court failed to determine whether the date she discovered her injury was reasonable. However, we need not determine whether her discovery was reasonable because under § 893.55(1)(b), STATS., her claim must have been brought, at the very latest, within five years after the negligent act giving rise to the cause of action. We have determined that Westphal's cause of action against Dr. Litow accrued on November 10, 1982. Under § 893.55(1)(b), her claim against Dr. Litow had to have been commenced no later than November 1987. Westphal's claim against Dr. Litow, commenced in October 1990, is barred by the statute of limitations.

*By the Court.*—Judgments affirmed.

GARTZKE, P.J. (*concurring in part; dissenting in part*). I agree with the majority's holding that du Pont is not responsible, as a matter of law, under a strict-liability or negligence theory. I disagree with its holding that Westphal's negligence action against Dr. Litow was untimely. *Robinson v. Mount Sinai Medical*

---

[4] That Westphal's experts opine that she underwent a continuous course of treatment or a continuous course of inappropriate treatment does not mean that she underwent a continuous course of *negligent* treatment for the purposes creating a single cause of action. We conclude that significant gaps in time between each negligent act precludes the application of the continuous negligent treatment doctrine. Westphal's experts' assertions that might be construed to the contrary do not create issues of fact.

375

*Ctr.*, 137 Wis. 2d 1, 28-29, 402 N.W.2d 711, 722 (1987), spells out the continuous-negligent-treatment test established in *Tamminen v. Aetna Casualty & Sur. Co.*, 109 Wis. 2d 536, 327 N.W.2d 55 (1982). The question is "whether a layperson *could* reasonably conclude that the facts fall within a single unit or occurrence." *Robinson*, 137 Wis. 2d at 27, 402 N.W.2d at 722 (emphasis added). The test is objective, and the *Robinson* court applied it to the pleaded facts to reach an answer as a matter of law. Because the test looks to what "a layperson could reasonably conclude," it should be liberally rather than strictly applied. The elements of the test are (1) continuous care, (2) continuous negligent medical care, (3) the medical care related to a single condition, and (4) the precipitating factor in the continuum was the original act of malpractice. *Id.* at 28-29, 402 N.W.2d at 722.

The majority confines its discussion to the second element, whether the negligent conduct was continuous. The majority states "that the amount of time that has passed between each allegedly negligent act is *necessarily a primary factor* in determining whether there has been a continuum of negligent treatment . . . ." Majority op. at 373–374 (emphasis added). Why the amount of time is "necessarily a primary factor" is not explained. The implication is that there may be other "primary" factors but the majority relies only on the passage of time between Dr. Litow's operation on November 10, 1982, and Dr. Messer's operation on December 13, 1984. Nor does the majority explain why the passage of about two years, without more, requires our holding that the second element, continuous negligent medical care, is unsatisfied.

To conclude that the negligent treatment was not continuous when about two years intervened between

the allegedly negligent acts establishes a bright-line test. However, I do not read the case law to mean that in all circumstances an interval of a certain period, without more, destroys the continuity of negligent medical care.

We ought not conclude that the two-year interval interrupts what would otherwise have been continuous negligent medical treatment. First, Dr. Litow's work did not stop with his November 10, 1982 operation on Westphal. In October 1983 and in March 1984, he inserted TMJ implants in Westphal's left and right TMJ's. That those insertions were not negligently performed is immaterial. A reasonable person in Westphal's position could have waited until well after those insertions to decide whether to commence an action against Dr. Litow for medical malpractice based on his November 10, 1982 surgery. Second, about eight-and-one-half months passed between Dr. Litow's last implant insertion in March 1984 and Dr. Messer's allegedly negligent procedure on December 13, 1984. A reasonable person could have waited to determine whether Dr. Messer's procedure rectified the medical problem. For those reasons, a layperson could reasonably conclude that the facts fall within a single unit or occurrence. I therefore conclude that the time between the first and second acts of alleged negligence is not such as to destroy the continuity of negligent treatment.

If it is desirable to establish a bright-line test to determine whether the time between acts of medical negligence destroys the continuity of the negligence, we should look to the medical-malpractice statute of limitations, § 893.55, STATS., for guidance. Section 893.55(1)(a) establishes a three-year limitation. Three years had not elapsed between the allegedly negligent

377

acts of Drs. Litow and Messer. Looking to the statute of limitations is arbitrary to the extent that the choice of any fixed period of time is arbitrary. The statute provides, however, a useful analogy because the legislature itself has fixed the time in which a person should start an action. The statutory analogy provides a rational basis on which to base the decision. The mere passage of about two years, without more, does not provide that basis.

We should hold that a continuum of negligent medical care exists in this case. It is undisputed that a continuum of care existed, the medical care related to a single condition and the precipitating factor in the continuum was the initial decision by Dr. Litow to operate in November 1982. We therefore should hold that the course of conduct here is such that a "layperson could reasonably conclude that the facts fall within a single unit or occurrence," *Robinson*, 137 Wis. 2d at 27, 402 N.W.2d at 722, and that Westphal's action was timely brought against Dr. Litow.